UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARK PASEK, MEREDITH CARR,
PATRICIA MORGAN, STEVEN MORGAN,
and JAMES MOLENAAR,

       Plaintiffs,

v.                                Case No. 2:21-cv-20-JLB-NPM

CRYSTAL K. KINZEL, in her official and
individual capacities,

       Defendant.

_____

# ORDER

Defendant Crystal K. Kinzel is the Collier County Clerk of the Circuit Court and Comptroller.  Plaintiffs are all former employees of the Clerk's office who were terminated by Ms. Kinzel in 2020.  Plaintiff James Molenaar was terminated after he filed paperwork announcing his intention to run for Ms. Kinzel's position.  The rest of the Plaintiffs, who supported Mr. Molenaar in his unsuccessful bid, were fired after he lost.  They now sue Ms. Kinzel under 42 U.S.C. § 1983 and claim their terminations violated the First Amendment.  Plaintiffs Mark Pasek, Meredith Carr, and Patricia Morgan also sue Ms. Kinzel for interference and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–54.  (Doc. 16.)

Ms. Kinzel moves to dismiss Plaintiffs' claims and argues that: (1) she was permitted to terminate Plaintiffs based on their political affiliations without violating the First Amendment because they were "deputy clerks" and therefore her

alter egos under Eleventh Circuit precedent, and (2) in her official capacity as the Clerk, she is sovereignly immune from Plaintiffs' FMLA claims.  (Doc. 20.)

After carefully examining Ms. Kinzel's motion, Plaintiffs' response, and Ms. Kinzel's reply, the Court believes Ms. Kinzel is correct.  Based on the Eleventh Circuit's categorical approach, Plaintiffs were indeed Ms. Kinzel's alter egos. Although Plaintiffs attempt to state a claim for political expression (as opposed to political affiliation), the Amended Complaint contains no facts to support such a claim.  And finally, while the Eleventh Circuit has not yet ruled on this issue, district courts generally seem to agree that a Florida circuit court clerk is an arm of the state that is entitled to sovereign immunity protection.

Accordingly, Ms. Kinzel's motion to dismiss (Doc. 20) is **GRANTED**.

## BACKGROUND

Plaintiffs are all former employees of the Collier County Clerk of the Circuit Court and Comptroller.  Each of them held different positions: Mr. Pasek was an "Auditor"; Ms. Carr was a "Recording Clerk I"; Ms. Morgan was a "Director of Board Minutes & Records"; Plaintiff Steven Morgan was an "Assistant Director of Information Technology"; and Mr. Molenaar was the "Manager of Internal Audit" and later "Sr. Legal Counsel."  (Doc. 16 at 2–3, ¶¶ 2–6.)

The parties appear to agree that while Plaintiffs' job duties were diverse, Plaintiffs were all hired as "deputy clerks."  (Doc. 16 at 4, ¶ 14; Doc. 20 at 2; Doc. 20-1.)  When Ms. Kinzel took office in 2018, Plaintiffs all signed an "oath and acceptance" form in which they acknowledged that Ms. Kinzel was appointing them as "deputy clerks" under her powers in Florida Statute § 28.06.  (Doc. 20-1.)  In

turn, section 28.06 provides that deputy clerks "shall have and exercise each and every power of whatsoever nature and kind as the clerk may exercise, excepting the power to appoint a deputy or deputies."

In May 2020, Mr. Molenaar "was fired . . . by [Ms. Kinzel] just days after he completed and publicly filed to run for her position." (Doc. 16 at 6, ¶ 23.) He claims that Ms. Kinzel "communicated [to him] that she was terminating [him] as a direct result of . . . him having exercised his First Amendment rights by filing paperwork to run against her in the upcoming election." (Id., ¶ 24.) The Amended Complaint provides that "[a]fter being fired and during his candidacy, [Mr. Molenaar] was critical of the [C]lerk's handling of the coronavirus pandemic and highlighted the mishandling of a phishing scam that cost the office $184,000 as one of the reasons to improve audit and internal control protocols." (Id., ¶ 26.)

The other Plaintiffs, who remained employed by the Clerk's office at that time, supported Mr. Molenaar's campaign in at least twelve ways described in the Amended Complaint: (1) volunteering  to solicit donations, (2) setting up his campaign website, (3) setting up payment portals for donations, (4) making donations, (5) placing yard signs on their private property that expressed support for Mr. Molenaar, (6) setting up a Facebook page for the campaign, (7) posting supportive comments on that Facebook page, (8) disseminating information about Mr. Molenaar's campaign, (9) suggesting to voters that they vote for Mr. Molenaar and not Ms. Kinzel, (10) attending campaign events, and (11) wearing t-shirts that expressed support for Mr. Molenaar.  (Id. at 7, ¶ 27.)

On August 18, 2020, Ms. Kinzel prevailed over Mr. Molenaar in a primary election.  (Id., ¶ 30.)  Two weeks later, on September 1, 2020, she terminated the other Plaintiffs.  (Id.)  According to the Amended Complaint, Ms. Kinzel read each Plaintiff a "prepared, typed statement" that she "no longer had trust and confidence in [their] abilities" to carry out their jobs.  (Id. at 8, ¶ 31.)  When Mr. Pasek asked her why he was being fired, Ms. Kinzel allegedly responded, "[I]f you think long and hard about it, you'll know exactly why."  (Id.)  In the wake of Plaintiffs' terminations, a spokesman for Ms. Kinzel allegedly told news media that Plaintiffs' positions were "eliminated"—a claim Plaintiffs contend is false because nobody else was fired, and the Clerk's office had a budget surplus.  (Id., ¶¶ 32–34.)

Mr. Pasek, Ms. Carr, and Ms. Morgan (collectively, "FMLA Plaintiffs") separately contend that prior to their termination, they informed Ms. Kinzel "of their likely need to take leave for their own serious health conditions."  (Id. at 15, 17 ¶¶ 67, 79.)  Ms. Kinzel allegedly determined that these three Plaintiffs were "eligible" for FMLA leave, but she fired them after they took said leave and requested reinstatement.  (Id. at 16, 18–19, ¶¶ 71, 84, 87.)  It is unclear how the timing of the FMLA Plaintiffs' leave overlaps with their election activities.

Plaintiffs now sue Ms. Kinzel in her individual and official capacities for First Amendment retaliation under a political affiliation theory (Count I) and a political expression theory (Count II).  The FMLA Plaintiffs separately bring claims against Ms. Kinzel for FMLA interference (Count III) and FMLA retaliation (Count IV).  (Doc. 16.)  Ms. Kinzel moves to dismiss Plaintiffs' First Amendment claims

because Plaintiffs, she contends, are her alter egos and therefore may be terminated for political disloyalty under Eleventh Circuit precedent. (Doc. 20 at 7–15.) She also argues that she is sovereignly immune from Plaintiffs' FMLA claims. (Id. at 15–20.)

DISCUSSION

**I.   Plaintiffs' First Amendment claims fail.**[1]

**A.   Bare statements of support for a candidate are governed by the <u>Elrod</u>-<u>Branti</u> test.**

As a threshold matter, the Court must determine which type of First Amendment claim is supported by the facts in the complaint. The Supreme Court has recognized two ways to analyze First Amendment retaliation claims brought by government employees. Claims based purely on political affiliation are governed by the <u>Elrod</u>-<u>Branti</u> test. <u>See</u> <u>Elrod v. Burns</u>, 427 U.S. 347, 374–75 (1976) (Stewart, J., concurring); <u>Branti v. Finkel</u>, 445 U.S. 507, 518 (1980). Claims based on expressive conduct or speech are governed by the <u>Pickering</u>-<u>Connick</u> test. <u>See</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968); <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983).

---

[1] When ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1274 n.1 (11th Cir. 1999) (citing <u>Hawthorne v. Mac Adjustment, Inc.</u>, 140 F.3d 1367, 1370 (11th Cir.1998)). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under this standard, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

Distinguishing between <u>Elrod</u>-<u>Branti</u> claims and <u>Pickering</u>-<u>Connick</u> claims is not always easy because political affiliation and political expression often go hand-in-hand.  But the Eleventh Circuit's precedent offers some helpful landmarks.  To state a retaliation claim based on expressive conduct or speech, a plaintiff must offer "more than bare statements of support for a candidate."  <u>Cutcliffe v. Cochran</u>, 117 F.3d 1353, 1358 (11th Cir. 1997).  In other words, a plaintiff must allege that he or she "engaged in expressive conduct beyond mere manifestation of political affiliation."  <u>Id.</u> at 1358 n.5.  For example, plaintiffs who allege "that they actively criticized [a defendant's] fitness or that they spoke out on the <u>issues</u> of public concern surrounding the campaign" could potentially state a political expression claim governed by the <u>Pickering</u>-<u>Connick</u> test.  <u>Silva v. Bieluch</u>, 351 F.3d 1045, 1047 (11th Cir. 2003).  Under the Eleventh Circuit's precedent, conduct that does not rise beyond a bare statement of support includes:

- Contributing personal funds to a campaign.  <u>Cutcliffe</u>, 117 F.3d at 1358.

- Appearing in campaign advertisements.  <u>Silva</u>, 351 F.3d at 1046.

- Attending political rallies.  <u>Id.</u> at 1046–47.

- Participating in "get out the vote" efforts.  <u>Id.</u> at 1047.

- Putting a sign supporting a candidate in your yard.  <u>Ezell v. Wynn</u>, 802 F.3d 1217, 1220 (11th Cir. 2015).

- Attending campaign kickoff events.  <u>Id.</u>

- Spending time at campaign headquarters.  <u>Id.</u>

- Attending public debates.  <u>Id.</u>

**B.**   **Plaintiffs do not state a political expression claim governed by the <u>Pickering</u>-<u>Connick</u> test.**

Ms. Kinzel's motion to dismiss applies the <u>Elrod</u>-<u>Branti</u> standard to both of Plaintiffs' First Amendment retaliation claims.  (Doc. 20 at 7–15.)  Plaintiffs respond that Count II of the Amended Complaint is based on political expression and should therefore be governed by the <u>Pickering</u>-<u>Connick</u> test.  (Doc. 22 at 10–12.) As explained above, however, "bare statements of support for a candidate" must be analyzed under <u>Elrod</u>-<u>Branti</u>.  <u>Cutcliffe</u>, 117 F.3d at 1358.

After reviewing the factual allegations in the Amended Complaint, the Court is confident that Plaintiffs have not pleaded a political expression claim.  Indeed, all of the allegedly protected actions in paragraph 27 (e.g., setting up a Facebook page for the campaign, putting up yard signs, etc.) are exactly the kind of conduct described in <u>Cutcliffe</u>, <u>Silva</u>, and <u>Ezell</u>.  The only allegation of political expression appears in paragraph 26, where Plaintiffs aver that Mr. Molenaar "was critical of the [C]lerk's handling of the coronavirus pandemic and highlighted the mishandling of a phishing scam that cost the office $184,000 as one of the reasons to improve audit and internal control protocols."  (Doc. 26 at 6, ¶ 26.)  But this political expression occurred after Mr. Molenaar had already been fired.  (<u>Id.</u> at ¶¶ 23, 26.)

Plaintiffs could state a political-expression claim if they were to "allege that they actively criticized [Ms. Kinzel's] fitness or that they spoke out on the <u>issues</u> of public concern surrounding the campaign."  <u>Silva</u>, 351 F.3d at 1047; <u>see also</u> <u>Stough v. Gallagher</u>, 967 F.2d 1523, 1524, 1528 (11th Cir. 1992) (applying <u>Pickering</u>-<u>Connick</u> test to retaliation claim of deputy sheriff who questioned a candidate's

qualifications at a political forum and urged the audience to vote for the other candidate).  But the Amended Complaint does not contain such allegations.  While paragraph 27 does provide that Plaintiffs "suggest[ed] to voters that they vote for [Mr. Molenaar] and not [Ms. Kinzel]," there is no allegation that they questioned Ms. Kinzel's fitness.  (Doc. 16 at 7, ¶ 27.)  And Plaintiffs do not allege that they spoke out on issues of public concern, besides claiming they "disseminated information about [Mr. Molenaar's] campaign and [its] message."  (Id.)

Absent allegations to support an expressive-conduct claim under Pickering-Connick, the Court will dismiss Count II of the Amended Complaint without prejudice for failure to state a claim.  Plaintiffs will be given one more chance to re-plead Count II and support it with allegations of protected conduct that rises beyond bare statements of political support.

### C.    Plaintiffs do not state a political affiliation claim governed by the Elrod-Branti test.

Having disposed of Plaintiffs' political expression claim, the Court now applies the Elrod-Branti test to Plaintiffs' political affiliation claim.  Under that test, the "ultimate inquiry" is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  Branti, 445 U.S. at 518; see also Elrod, 427 U.S. at 367 (plurality opinion); id. at 374–75 (Stewart, J., concurring).

To determine whether political affiliation is an appropriate job requirement, the Eleventh Circuit takes a "categorical approach."  Underwood v. Harkins, 698 F.3d 1335, 1344 (11th Cir. 2012).  Specifically, the Eleventh Circuit asks whether

8

state or local law gives the plaintiffs "the same statutory powers and duties" as the elected official for whom they work.  Id. at 1343.  If so, then the plaintiff "is essentially the legal alter ego" of the elected official and therefore "the type of confidential employee who can be terminated" under Elrod-Branti.  Id.  If not, then whether the plaintiff "is a confidential employee from whom loyalty can be demanded will ordinarily need to be determined as a matter of fact."  Id. at 1345.  Importantly, it does not matter that "an elected official has not given a particular immediate subordinate all of the discretionary or policymaking authority available under state or local law" because such a retention of power "does not prevent that official (or a future one) from changing her mind, or from choosing to expand a subordinate's duties if she is able to hire the subordinate of her choice."  Id. at 1344.  Applying these principles, the Eleventh Circuit in Underwood determined that a deputy clerk of a Georgia court could not bring a political affiliation claim against the clerk of court because "the Georgia Legislature chose to give persons holding her job the same powers and duties as the clerk herself."  Id. at 1345.  The actual job duties of the plaintiff in Underwood were "things . . . a secretary would do."  Id. at 1337.  But that fact was not relevant to the Eleventh Circuit's categorical approach.

Plaintiffs concede that when Ms. Kinzel first took office in 2018, she had each of them execute a document titled "Oath & Acceptance" which provided that they were being appointed deputy clerks under Florida Statute § 28.06.  (Doc. 16 at 4, ¶ 14; Doc. 20-1.)  Section 28.06 provides as follows:

> The clerk of the circuit court may appoint a deputy or deputies, for whose acts the clerk shall be liable, and the said deputies shall have

<u>and exercise each and every power of whatsoever nature and kind as
the clerk may exercise, excepting the power to appoint a deputy or
deputies</u>.

(Emphasis added.)  The plain language of section 28.06 leaves no ambiguity that the
Florida legislature has empowered deputy clerks with the same powers as a clerk of
a Florida circuit court.  Accordingly, this case presents a fairly straightforward
application of the categorical approach in <u>Underwood</u>.

Plaintiffs disagree and present three commendably creative arguments.
First, they argue that the Clerk's employee manual provides that all employees will
receive "fair and equitable treatment in all aspects of personnel administration
without regard to . . . political affiliation."  (Doc. 16 at 5, ¶ 17; Doc. 22-1 at 10–11.)
This language, according to Plaintiffs, "waive[s] any alter ego defense that could be
analyzed under a categorical approach."  (Doc. 22 at 7.)  But <u>Underwood</u> directs the
Court to analyze whether state or local law gives the plaintiff "the same statutory
powers and duties" as the defendant.  698 F.3d at 1343.  An employee manual,
carries no weight.  <u>Ezell</u>, 802 F.3d at 1222–23 (explaining that besides state and
local law, "[n]o other legal or practical dimensions . . . in a particular case are
relevant to the inquiry")

Second, Plaintiffs cite language from a budget report which suggests that the
Clerk's office "has created functional divisions" and "[e]ach division is headed by a
Director."  (Doc. 22 at 8; Doc. 22-2 at 33.)  Because none of the Plaintiffs are
directors, they contend that they are not "<u>immediate</u> subordinates" of Ms. Kinzel
and thus not subject to <u>Underwood</u>'s alter-ego defense.  The budget report is not
referenced in the Amended Complaint.  But assuming the Court could consider it,

the budget report does not change the categorical nature of <u>Underwood</u>.  Plaintiffs'
argument is essentially that their actual job duties do not entail working directly
under Ms. Kinzel's supervision, and therefore they cannot be "immediate
subordinates."  As <u>Underwood</u> instructs, however, "the actual everyday work . . . is
not determinative.  What matters in a case like this one is not what the subordinate
actually does on a day-to-day basis, but rather what the subordinate is legally
empowered to do under state or local law."  698 F.3d at 1344; <u>see also</u> <u>Ezell</u>, 802
F.3d at 1225 (explaining that a review of state and local law to determine if the
subordinate is the alter ego of the elected official "ends the inquiry").  There is no
dispute that deputy clerks are empowered to carry out all of the duties of a circuit
court clerk under section 28.06.

Finally, Plaintiffs argue that the "oath and acceptance" forms they signed
only allow them to act "to the extent and in such matters as authorized by [their]
principal, the Clerk of the Circuit Court of Collier County, and within the scope of
the statutory duties assigned to that office."  (Doc. 20-1.)  They contend that the
practical effect of this limiting language is that "if [Ms. Kinzel] said not to do
something that was legally required of one of the Plaintiffs, such as issuing a
marriage license . . . they had to obey whereas Florida law says they must perform
their duties."  (Doc. 22 at 10.)  As already explained, this has no bearing on
<u>Underwood</u>'s categorical approach.  698 F.3d at 1344 ("The fact that an elected
official has not given a particular immediate subordinate all of the discretionary or

policymaking authority available under state or local law does not prevent that official . . . from changing her mind . . . .").

To be sure, the Court is sympathetic to Plaintiffs' position. As Plaintiffs point out, the Clerk's office "employed 193 employees in 2020 and all 193 had the same appointment, the absurd result of which would be the deputization of an entire workforce thus allowing illegal terminations to proceed with impunity and without judicial oversight." (Doc. 22 at 9.) Section 28.06's predecessor statute, which affords deputy clerks the same broad powers, was passed in 1823—before Florida was a state and most likely before clerks' offices were staffed by a professional civil service. See Ch. 744, Laws of Fla. Territory (1823); see also Elrod, 427 U.S. at 354 (plurality opinion) ("[O]nly a few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service." (footnote omitted)). It is difficult to understand why political loyalty is necessary for an "Assistant Director of Information Technology" or "Director of Board Minutes & Records." But that is the inevitable result of the categorial approach, and the Court is bound to apply it.[2] Accordingly, Plaintiffs' political-affiliation claim must be dismissed with prejudice.

---

[2] Not all federal circuits apply Underwood's categorial approach. See Lawson v. Union Cnty. Clerk of Ct., 828 F.3d 239, 249 (4th Cir. 2016) (holding that political loyalty was not an appropriate qualification for a deputy clerk who had "the statutory authority" to act on the clerk's behalf because none of the deputy clerk's actual duties "involved setting or implementing a policy agenda").

## II.    Plaintiffs' FMLA claims also fail.[3]

The FMLA Plaintiffs bring claims against Ms. Kinzel in both her individual and official capacity for interference and retaliation under the statute.  (Doc. 16 at 15–20.)  Ms. Kinzel advances two arguments for dismissal.  First, she argues that any individual-capacity FMLA claims must be dismissed because the Eleventh Circuit has held that a public official sued in his or her individual capacity is not an "employer" under the FMLA.  (Doc. 20 at 15–16); Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999) ("We hold that a public official sued in his or her individual capacity is not an 'employer' under the FMLA, and therefore there is no federal subject matter jurisdiction over such a claim.").  The FMLA Plaintiffs concede that Wascura controls on this point.[4]  (Doc. 22 at 18 n.10.)  Accordingly, Plaintiffs' FMLA claims against Ms. Kinzel in her individual capacity must be dismissed.

Ms. Kinzel next argues that she is sovereignly immune from any FMLA claims against her in her official capacity because Florida circuit court clerks are arms of the state.  (Doc. 20 at 16–21.)  The FMLA Plaintiffs disagree and argue that

---

[3] A motion to dismiss on sovereign immunity grounds is governed by Federal Rule of Civil Procedure 12(b)(1).  See Thomas v. U.S. Postal Serv., 364 F. App'x 600, 601 n.3 (11th Cir. 2010).  The burden of proof on a Rule 12(b)(1) motion lies with the party that seeks to establish subject matter jurisdiction.  See Lawrence v. United States, 597 F. App'x 599, 602 (11th Cir. 2015) (citation omitted).  Thus, FMLA Plaintiffs "bear[] the burden of establishing a waiver of sovereign immunity."  Id.

[4] Plaintiffs' counsel notes that he has asked the Eleventh Circuit to reconsider its reading of FMLA individual-capacity claims.  See Fonte v. Lee Mem'l Health Sys., No. 20-13240 (11th Cir.).  Be that as it may, the Court must apply precedent as it currently exists.

circuit court clerks are not entitled to sovereign immunity because they are local government entities, not arms of the state.[5]  (Doc. 22 at 13–18.)

"To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State."  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30 (1997)).  "Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise."  Id. (citation omitted).  Courts in the Eleventh Circuit analyze four factors to determine whether an entity is an arm of the state for the purposes of sovereign immunity: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  Id. at 1309.

---

[5] Here, it is important to note that the Court is discussing sovereign immunity for purposes of federal law.  Florida appears to have extended sovereign immunity under state law "to all constitutionally authorized governmental entities and not in a disparate manner."  Cauley v. City of Jacksonville, 403 So. 2d 379, 387 (Fla. 1981).  This nuance occasionally causes confusion in cases involving state-law causes of action.  Compare Fluid Dynamics Holdings, LLC v. City of Jacksonville, 752 F. App'x 924, 925 (11th Cir. 2018) ("Florida municipalities and municipal agencies enjoy sovereign immunity."), with Irizarry v. Orlando Utilities Comm'n, No. 6:19-cv-268-Orl-37EJK, 2020 WL 5534424, at *3 (M.D. Fla. June 23, 2020) (concluding that Florida municipalities do not enjoy the full spectrum of sovereign immunity even under Florida law).  But the FMLA is not state law, and Florida's extension of sovereign immunity to local governmental entities cannot influence federal jurisdiction.  See Chicot Cnty. v. Sherwood, 148 U.S. 529, 534 (1893).

The Eleventh Circuit has never addressed whether a Florida circuit court clerk is an arm of the state.  It has, however, concluded that Florida state judges, court administrators and their staff, and the Florida Bar all constitute arms of the state.  See Blankenship v. Childers, No. 3:12-cv-216-MW-EMT, 2013 WL 6536827, at *5 (N.D. Fla. Nov. 14, 2013) (collecting Eleventh Circuit cases), adopted, 2013 WL 6536898 (N.D. Fla. Dec. 13, 2013).  With this body of law in mind, every district court to address the issue has determined that Florida circuit court clerks are also arms of the state.  Id.; see also Gilliard v. Rogers, No. 8:15-cv-2638-T-33EAJ, 2016 WL 727582, at *3 (M.D. Fla. Feb. 24, 2016); Micklas v. Phillips, No. 12-61010-Civ, 2012 WL 3756981, at *3 (S.D. Fla. Aug. 28, 2012), aff'd, 522 F. App'x 616 (11th Cir. 2013); cf. Hewlett-Packard Fin. Servs. Co. v. Brevard Cnty. Clerk of the Cir. Ct., No. 6:14-cv-60-Orl-36DAB, 2014 WL 1464410, at *4 (M.D. Fla. Apr. 15, 2014) (reaching similar conclusion for purposes of diversity jurisdiction).[6]  After considering the factors in Manders, this Court reaches the same conclusion.

First, state law defines the circuit court clerks as state entities, not local entities.  Clerks derive their powers from two provisions in the Florida Constitution: article V, section 16, and article VIII, section 1(d).  The FMLA Plaintiffs rely exclusively on the latter of these provisions, which states that a circuit court clerk

---

[6] In Micklas, the Eleventh Circuit determined that the district court erred in applying sovereign immunity to the defendant court officials because almost all of the plaintiff's claims were against those officials in their individual capacities.  522 F. App'x at 619.  But the Eleventh Circuit affirmed on alternative grounds and did not question the district court's conclusion that circuit court clerks—in their official capacity—are arms of the state.  Id.

15

"shall be ex officio clerk of the board of the board of county commissioners, auditor, recorder and custodian of all county funds." Fla. Const. art. VII, § 1(d). But the Florida Supreme Court has held that, "when acting under the authority of their article V powers concerning judicial records and other matters relating to the administrative operation of the courts," circuit court clerks are "an arm of the judicial branch and are subject to the oversight and control of the Supreme Court of Florida." Times Publ'g Co. v. Ake, 660 So. 2d 255, 257 (Fla. 1995). Nothing suggests that Ms. Kinzel was acting in her capacity as a county officer under article VII when she terminated the FMLA Plaintiffs. On the contrary, personnel decisions seem to relate to "the administrative operation of the courts," which falls within the clerk's article V powers. Times Publ'g Co., 660 So. 2d at 257. Accordingly, this factor weighs in favor of finding the clerk an arm of the state.

Second, while the degree of state control over a clerk's decision to fire an employee is unclear, many of the clerk's judicial functions are tightly regulated by the state. For example, the state "maintains near absolute control" over how clerks record documents in the public record. Gilliard, 2016 WL 727582, at *3. And certain aspects of employment are clearly controlled by state law, as reflected in the employee manual that Plaintiffs have provided to the Court. For example, employment of the clerk's relatives is restricted by state law. See Fla. Stat. § 112.3135(2)(a); (Doc. 22-1 at 23 ("The employment of relatives in the Clerk's office is prohibited, unless specifically approved by the Clerk, in accordance with Chapter 112.3135 Florida Statutes.")). Policies designed to implement bonus payments are

16

controlled by state law.  See Fla. Stat. § 215.425; (Doc. 22-1 at 48) ("Florida Statutes provide for the Clerk of the Circuit Court, at his discretion, to grant monetary bonuses to eligible employees in recognition of outstanding performance and/or significant contributions made to the organization.").  Reimbursement of employees' travel expenses is controlled by state law.  See Fla. Stat. § 112.061; (Doc. 22-1 at 52) ("Due to the necessity for travel, this policy incorporates Section 112.061, Florida Statutes . . . .").  Given the many ways in which the state controls the Clerk's management of personnel, this factor weighs in favor of finding the clerk an arm of the state.

Third, as the FMLA Plaintiffs correctly point out, "clerks of circuit courts are designed to be partially self-funded, deriving a portion of their funds from filing fees, service charges, and costs for performing court-related functions."  Gilliard, 2016 WL 727582, at *3; (Doc. 22 at 16–17.)  Yet an entity that can independently raise money may still be an arm of the state if its budget is tightly controlled by the state.  See Fouche v. Jekyll Island-State Park Auth., 713 F.2d 1518, 1520–21 (11th Cir. 1983) ("Even though the Park Authority can raise money through the issuance of bonds and from the operation of Jekyll Island State Park, its fiscal life is controlled by the state.").  The budgeting procedure of a circuit court clerk is controlled by state law and by a state entity known as the Florida Clerks of Court Operations Corporation.  Fla. Stat. §§ 28.35, 28.36, 28.37.  Thus, the Court holds that this factor also weighs in favor of finding the clerk an arm of the state.

Fourth, at least one court has suggested that a judgment against a Florida circuit court clerk may be payable through Florida's "State Risk Management Trust Fund." Blankenship, 2013 WL 6536827, at *5; Fla. Stat. §§ 284.30, 284.31.  Neither side has clarified whether a circuit court clerk is excluded from participating in the fund.  See Fla. Stat. § 111.071 (authorizing any state agency excluded from the fund to expend money to pay judgments).  But even if this factor were to weigh against finding the clerk an arm of the state, the remaining three factors weigh in favor.

In sum, after considering the relevant factors, this Court holds that the Collier County Clerk of the Circuit Court and Comptroller is an arm of the state.  As a result, Ms. Kinzel (in her official capacity) is protected by sovereign immunity. The FMLA Plaintiffs make no waiver arguments, and none could plausibly be made.  See Coleman v. Ct. of Appeals of Md., 566 U.S. 30, 43–44 (2012) (holding that the FMLA's self-care provisions, as opposed to its family-care provisions, do not validly abrogate sovereign immunity).  Accordingly, the claims against Ms. Kinzel in her official capacity in Counts III and IV of the Amended Complaint must be dismissed without prejudice on sovereign immunity grounds.

### CONCLUSION

For the reasons above, it is **ORDERED**:

1.  Ms. Kinzel's motion to dismiss (Doc. 20) is **GRANTED**.

2.  Count I of the Amended Complaint is **DISMISSED WITH PREJUDICE.**

3.      Count II of the Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.  No later than October 29, 2021, Plaintiffs may attempt to re-plead Count II in a Second Amended Complaint.

4.      Counts III and IV are **DISMISSED WITHOUT PREJUDICE** on the basis of sovereign immunity.

**ORDERED** in Fort Myers, Florida, on October 14, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE